# Qualifications and Expected Testimony of
# Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)
# Special Agent Aaron Chaffee

**Training and Experience:**

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Agent. I am empowered by Department of Justice to conduct investigations, to make arrests for offenses against the United States, and performs such other duties as authorized by law.

2. I have been employed with the ATF since July 2015 and currently assigned to the Wichita Field Office. Prior to joining the ATF, I was a police officer with the Wichita Police Department (WPD), for nearly 10 years. As a Special Agent with ATF and/or WPD, I have received training in arson, explosives, firearms, tobacco, violent crime, gang related investigations and drug trafficking investigations. As a Special Agent with ATF and/or WPD, I have conducted and/or participated in numerous investigations involving, explosives, firearms, controlled substances, arsons, and violent crimes.

3. I have been the lead investigator and/or assisted in numerous investigations which utilized confidential informants (CI's) and/or undercover (UC's) law enforcement personnel. These include investigations into individuals, organized groups of individuals distributing drugs in Kansas, as well as investigations into groups trafficking drugs and firearms throughout the country. In support of these investigations, I have conducted thousands of interviews/debriefs with gang members, suspects, witnesses, cooperating defendants, CI's and UC's into how the drug and firearm businesses operate. Additionally, I have received training in conducting large scale, multi-defendant complex criminal investigations. Throughout these investigations, I have become familiar with how individuals and organizations use computers, cellular telephones, and social media in their "criminal world" and in their networks. I have become aware that information stored by social media companies on behalf of its subscribers and users can assist law enforcement in criminal investigations. These investigations have resulted in the arrest and conviction of defendants for state and federal violations.

4. Due to my education, training, and experience as a law enforcement officer dealing with gangs, violent crime, drugs, firearms, arsons, and social media, I have provided both formal and informal training to other law enforcement officials at the local, state, federal levels, as well as outside groups.

## Prices and Quantities of Drugs:

5. Based upon my training, experience, communication with other law enforcement personnel, and interviews of numerous drug offenders, I have learned that the price and profits made by selling drugs, including but not limited to, counterfeit prescription pills, heroin, and cocaine, can vary on several factors. Examples of these factors are, quantity purchased, availability of the drug, and trust of the coconspirators. Typically, the closer an individual is to the source of the supply, the cheaper the drugs are. This is due to the larger quantities that are typically purchased, with less markup. This allows the dealer to sell or "front" the drugs to their enterprise at prices that maximize profits. These profits can go to either purchasing additional drugs or go to profits for the dealer(s)/ enterprise.

6. The availability of the drugs will also dictate the purchase price. I am aware that the price of drugs in one area of the country may differ from the price of the same quantity of drugs in another area of the country. Most illicit drugs originate outside of the United States, specifically, areas closest to Latin America and Asia, such as South Florida, the Southwest Border of the United States, and California. Drugs that come into the United States in these areas, are typically lower in price because of the high availability. The more available the drug is, the cheaper the prices, the less available the drug is, the more expensive it is. For example, in 2019 in Wichita, KS when counterfeit prescription pills containing fentanyl were starting to come into Wichita, a local dealer was purchasing them from sources of supply for $15-$20 per pill. The dealer would sell them to consumers for $25-$35 per pill. In 2022, as these pills were becoming for available, higher-level dealers of an organization were getting them from areas closer to the US boarder for $1 per pill and "fronting" them to their local organization in Wichita at $2 per pill.  The organizational dealers were selling them to local dealers for $4-$7 per pill and then sell them to consumers for $15-$20 per pill. Although in western Kansas, consumers were still paying $25-$35 due to the low availability.

7. Additionally, another way the availability and profits can be maximized by an enterprise is manufacturing the drugs themselves. When the drugs are manufactured, such as making counterfeit prescription pills containing fentanyl, the sources of supply can maximize their profits because they are not having to purchase them from anyone. Other than paying for materials/chemicals to make the drugs, once the drugs are sold to dealers and consumers, the manufacturer will likely have larger profit margins.

8. Lastly, the trust of the conspirators can influence prices and profits. The more a conspirator sells, the more trust the source of supply will have in that person. This means the conspirator can receive drugs from the source of supply at a cheaper rate than those who are not as trusted or effective at selling their drugs.

9. Typically, a dealer of counterfeit prescription pills containing fentanyl will possess as little as hundred(s) to over hundreds of thousands of pills. The quantities of drugs a dealer possesses can be related to how close an individual is to a source of supply or if manufacturing them. Higher level dealers of methamphetamine, heroin, and cocaine will deal in quantities of pound(s) to kilo(s). One way a dealer will help keep track of their business profits, money owed to them, and/or drugs provide a network, is the use of "ledgers". "Ledgers" will typically have names or aliases with dollar amounts that are owed to the dealer. Utilizing the "ledger" helps the dealer keep track of profits and allows their drug business to operate more efficiently.

### Different levels of Drug Dealing aka "Source of Supply":

10. It is my experience there are different levels of drug dealing, aka "source of supply". A higher-level drug dealer is as an individual who organizes the movement of drugs from one region to another region. This individual is at the top or close to the top of an organization. This person is typically getting their product at the cheapest price. The higher-level drug dealer will typically be a source for the mid-level dealer. A mid-level is a more localized drug dealer. This individual organizes local drug distribution rings, providing drugs to local street level dealers. A street level drug dealer is an individual that sells drugs directly to the consumers. The lowest level dealer is an individual that is habitual dealer. These individuals sell anything to support his or her own drug addiction. In my experience, it is common for dealers to engage in selling more than one type of drug, such as selling marijuana and prescriptions pills, to maximize their profits. Additionally, individuals, unknowing to their origination, can receive different drugs from different organizations, in a way to maximize one's individual profits.

11. The level of drug dealer can also be representative of the amount of money a drug dealer makes or profits. A higher-level drug dealers will have greater profits allowing them to purchase such things as larger quantity of drugs, business, residences, and expensive items. The higher-level dealer will typically have businesses, properties or have different investments to conceal the proceeds of their illegal drug activity. Mid-level dealers will have large quantities of money but not enough to invest into business, properties, or such things. Profits made from a mid-level dealer will go to purchasing material items, such as cars, expensive clothes, jewelry, and traveling. A street level dealer will use profits to support their lifestyle with varying smaller material flashy items.

12. As it pertains to prescription pills here in the District of Kansas, law enforcement has been experiencing an increase in the distribution of counterfeit pills containing fentanyl. Mostly, these drugs are being shipped through the southern border out of Mexico where the pills are being made for sale in huge quantity. Most of the pills arrive ready for sale in the United States. The pills are made by using illegal compounds and pressed into pill form using pill

press machines. During the making of the pills, precursors, such as acetaminophen are crushed into a white powder. The fentanyl is then added to the precursors along with a color to give the pills a consistent look of a legal pharmaceutical grade pill.

## Individuals and Organization:

13. I am aware that individuals within an enterprise are typically allowed certain access to other individuals involved in the enterprise.  This is typically due to the intentional compartmentalization that organizations employ in order to insulate high ranking members from law enforcement detection. Often prospective purchasers of drugs and/or associates who wish to purchase larger quantities of drugs must utilize another member with access to a source of supply in order to obtain a larger quantity of drugs.  Individuals involved in the enterprise often require that new or prospective customers be vetted by another member of the enterprise prior to conducting a future transaction.  Criminal associates engaged in a drug conspiracy also may have differing access to prospective customers. For example, if one co-conspirator has drugs on hand to distribute, but has no prospective buyers, he/she may seek the assistance of the co-conspirator if that individual has access to prospective customers. There is a mutual benefit to both criminal associates which allows the enterprise to continue.

14. Based on my training and experience, higher-level drugs dealers, who are a part of enterprise, may utilize other trusted members of the enterprise to transport large quantity of drugs from one region to another region. At times, this person is referred to as a "mule". This can be done by varying ways, such as utilizing vehicles. Sometimes these vehicles will have compartments to conceal the drugs. I learned in this investigation and as well as others that anther mode of transportation used by drug traffickers to move drugs from one region to another region is utilizing commercial passenger planes. Traffickers will put the drugs in their checked luggage. The luggage is flown to another location where either a transporter would get it or a different, previously planned member, of the enterprise would receive the luggage.

15. Through my training and experience I am aware that drug traffickers, organization(s), and money launderers frequently attempt to hinder the investigative efforts of law enforcement. Specifically, drug traffickers and money launderers often utilize fictitious names or the names of others when obtaining telephone service, registering vehicles, and completing financial transactions.  Drug traffickers and money launderers also often change telephones/telephone numbers on a regular basis, change transportation routes utilized by couriers, change vehicles and residences regularly, establish false businesses to act as a cover for their illegal activity, and use terminology and coded language regarding drug trafficking and money laundering activities that is intended to disguise the true nature of their communications.

16. I am aware that individuals and criminal enterprises typically utilize terminology and coded language that is specific to their organization. This includes slang terms for the drugs they are selling, such as "perc 30s", "blues", "M30s", for counterfeit prescription pills containing fentanyl, and "soft" for cocaine. I have also learned that traffickers do not always utilize the same terminology and coded language with all of the members of their enterprise.  In deciphering coded language, I utilize my training and experience in conjunction with the context of the communication, and the context of the investigation.  I have also learned through my training and experience that frequently there is a series of communications by, including but not limited to, cellular telephones, social media platforms, third party apps, between traffickers when speaking about a drug transaction utilizing coded language. Enterprises will also utilize "burner phones" or "trap phones" to conduct business. Typically, these phones are used for criminal business and contain very little identifying information and limited to coded information discussing their criminal business. Typically, individuals do not use these phones for long periods of time and will drop them and get new phones regularly. This is done to further hide their criminal activity from law enforcement. Enterprises will also utilize "stash houses" to hide their drugs and proceeds from law enforcement or rivals. Typically, these stash houses are residences or structures that are not lived in and are only utilized to conduct "business" for the enterprises.

17. Additionally, individuals who run enterprises will use force or the threat of force against coconspirators, associates, or rivals who try to disrupt or disrespect the enterprise. Disruption(s) or disrespect can occur by not providing money for drugs, someone stealing drugs or money from the organization, cooperating with law enforcement, testifying in court proceedings, or any manner that is deemed disrespectful to the upper-level individuals of the enterprise. This is especially prevalent in organizations whose members have historically used violence as a way to conduct business, such as gangs.

## Use and Possession of Firearms:

18. Based on my training and experience in conducting drug investigations, making arrests of drug traffickers, executing search warrants of drug traffickers' dwellings and conveyances, and conducting interviews of drug traffickers, I am aware that drug traffickers often possess weapons, typically firearms, on their person or in close proximity as a means to protect themselves and their illicit trade.  Drug traffickers typically refer to their distribution of illicit narcotics as a "business". This criminal enterprise relies on a product (illicit narcotic) which is in high demand and has a large profit margin. The drug trafficker often is utilizing U.S. currency to purchase illicit narcotics in order to then distribute the narcotics in a manner which allows the trafficker to make a substantial profit. During the whole endeavor, every portion of the drug trafficking enterprise is under threat of not only law enforcement, but other criminal organizations. Unlike legitimate businesses, drug traffickers cannot purchase

insurance or report "losses" of product to law enforcement. Therefore, drug traffickers often utilize firearms to protect themselves and their business from theft, robbery, and loss as this directly effects the profit margin. Due to the value of the drugs, drug traffickers often fear robbery or theft and thus utilize firearms as a means to protect their drugs in order to continue operating their illicit business. In some cases, traffickers are provided drugs to sell from a source of supply without having paid for the drugs in advance, or "fronting". Drug traffickers who owe money to a source of supply are reliant on distributing those drugs in order to not only make a profit, but to pay back the source from which they received the drugs. Failure to do so can place themselves not only in jeopardy of not being provided drugs to distribute in the future, but physical harm from the source of the drugs. Due to many drug traffickers and other individuals engaged in criminal activity having a criminal history which would preclude them from owning a firearm legally, many purchase firearms illicitly through other criminal associates and organizations to remain undetected by law enforcement. These firearms are typically acquired through other criminal activities such as robbery, residential and commercial burglary, theft, and through the use of legitimate purchasers who in turn knowingly or unknowingly sell the firearm to an individual who is legally not allowed to own the firearm.

### Review of Case 22-CR-10053-01-10-EFM:

19. My opinion for this matter is based on, including but not limited to, my training and experience, my overall knowledge of this investigations, my knowledge from working similar investigations, communicating with other investigators, interviews conducted during the investigation, review of cellular telephones, social media, GPS bracelets, review of reports, and a review of cameras.

20. Based on my training, experience, and knowledge in this investigation, in my opinion, Danny GRIFFIN had a source for large quantities of counterfeit prescription pills containing fentanyl, heroin, and cocaine in Arizona. Danny GRIFFIN and his members of his organization, that included but not limited to, Billy TAYLOR, Ricky ARMOUR, Victor NUNEZ, Tevin TAYLOR, Leigh TAYLOR, Donte HOPIKNS, and Dalecia ANTHONY, would transport the drugs to Wichita, Kansas. Once in Wichita, Danny GRIFFIN would front these drugs to his network, who then would sell the drugs to individuals in the area. After enough product was sold, these individuals would provide money back to Danny GRIFFIN, allowing him to purchase additional drugs from Arizona. This is confirmed through interviews with Danny GRIFFIN, Leigh TAYLOR, and Tevin TAYLOR. Additionally, investigators received two separate drug ledgers from Danny GRIFFIN's phones. The total amounts that Danny GRIFFIN was owed in these two ledgers was over $900,000. These ledgers are presented in Figure 1.




(Figure 1 – Drug Ledgers from Danny GRIFFIN's cellular telephones)

21. After Danny GRIFFIN's arrest on June 29, 2022, and in a post Miranda statement, he admitted to receiving counterfeit prescription pills containing fentanyl in Arizona for $1/pill and then would front his network at $2/pill, with the most recent shipment being 200,000 pills. Based on 2022 drug prices in the Midwest, including Kansas, 200,000 pills at $17/pill have a street value of *$3.5 million*. Danny GRIFFIN admitted to regularly fronting individuals in his network 10k-50k pills.

22. Investigators learned of a drug seizure on March 22, 2021, in Mesa, Arizona, involving Danny GRIFFIN, Billy TAYLOR, and Ricky ARMOUR. These individuals flew commercial airlines from Kansas to Mesa, Arizona and were at the airport, enroute back to Kansas, when the drugs were seized. The seizure included 2550 grams (approx. 24,000 pills), 1512 grams (3.3 pounds) of heroin and 26 grams of cocaine. Danny GRIFFIN's fingerprints were on a bag of fentanyl pills and Billy TALOR's fingerprints were on the exterior bag that contained all the separate bags of fentanyl pills. Both Billy TAYLOR and Ricky ARMOUR are on drug ledgers, owing money to Danny GRIFFIN. Based on aforementioned 2022 drug prices in the Midwest, including Kansas, the 24,000 pills have a street value of approximately $17/pill ($30/pill in 2020 and 2021), totally *$408,000*. Heroin has an approximate street value of $28,000/Kilogram. The seized heroin being approximately 1.5 Kilograms, the value would be *$42,000* for the 3.3 pounds. The approximate street value of the 1 ounce of cocaine is *$1,100*. Based on these numbers this drug seizure had a street value of *$451,100*. During the

7

seizure, phone toll analysis shows Danny GRIFFIN was calling Victor NUNEZ shorting after the drugs were seized by airport officials. In my opinion, based on the large quantity of drugs, statements during interviews, and Danny GRIFFIN drug ledgers, the drugs seized on March 22, 2021, is for distribution in the area in/around Kansas and are associated with the Danny GRIFFIN drug distribution network. Additionally, the amount income that could be made from this amount of drugs is substantial. The drugs seized in Mesa, AZ are presented in Figure 2.



(Figure 2 – Pills, heroin and cocaine seized in Mesa, AZ)

23. Investigators learned of drug seizure on March 28, 2022, in Wichita, KS, involving Victor NUNEZ. Victor NUNEZ was stopped after committing a traffic violation. During the investigation, investigators seized 4,300 (at $17/pill, street value of $73,100) counterfeit prescription pills containing fentanyl. During the traffic stop, Victor NUNEZ admits to possessing and selling fentanyl. During this traffic stop NUNEZ tells investigators he is coming from Edmond, OK. In Victor NUNEZ's cell phones, he is communicating with a phone associated with Billy TAYLOR. Billy TAYLOR resides in Edmond, OK. During the phone communications, Billy TAYLOR provides an address (1357 Belmont) in Wichita to Victor NUNEZ. Victor NUNEZ also provides this address to WPD during car stop as a placed he stopped in Wichita. Follow up shows the address did not exist. Billy TAYLOR calls and text Victor NUNEZ's phones several times during stop. These communications are presented in Figure 1.



(Figure 3 – Shows Billy TAYLOR (blue box) communicating with Victor NUNEZ (green box) agreeing to meet up prior to the traffic stop occurring at 12:55 PM)

24. Reviewing Danny GRIFFINs seized phones from 2021 and 2022 show communications phone numbers associated with Victor NUNEZ. Some of the communications show Danny GRIFFIN receiving locations to meet in AZ from Victor NUNEZ. During Danny GRIFFIN's interview, he says his source of supply is in AZ and Victor NUNEZ lives in AZ. Danny GRIFFIN says he gets his pills for $1/pill and Victor NUNEZ tells WPD he sells the pills at $1 – $1.25/pill. In my opinion, based on the large quantity of drugs, statements during interviews, Danny GRIFFIN drug ledgers, and review of cellular telephones, the drugs seized on March 28, 2022, is for distribution in the area in/around Kansas, are associated with the Danny GRIFFIN drug distribution network. Additionally, the phones used were to facilitate a drug trafficking crime.

25. On June 29, 2022, investigators executed several search warrants in the Wichita, KS. Drugs were seized from the residence 11307 W. Cindy, Leigh and Tevin TAYLOR's residence, and the stash house 2501 E. Douglas leased to Donte HOPKINS. During these search warrants, investigators seized a total of 854 grams of cocaine (30ozs at $1,100/oz totals *$33,000*) 1006 grams of fentanyl mixture (sold as kilo of Heroin, value of $*28,796)*, over 400 grams of marijuana (14ozs at $177/oz totals $*2,478*), and 663 grams of fentanyl pills (6,500 pills at $17/pill totals $*91,000*). The street value of the drugs seized was *$155,274*. In my opinion, based on the large quantity of drugs, statements during interviews, US Currency seized, Danny GRIFFIN drug ledgers, and observations made while monitoring the cameras, the drugs seized on June 29, 2022, is for distribution in the area in/around Kansas, are associated

9

with the Danny GRIFFIN drug distribution network. Additionally, these residences were used to store these drugs.

    a. At 11307 W. Cindy, investigators seized a total of 352 grams of cocaine, 663 grams of fentanyl pills, and over 400 grams of Marijuana. Also, in Tevin TAYLOR's room, investigators located (1) Mossberg, Shockwave, 12-gauge, shotgun, S/N: VO605254 (Stolen), (1) Ruger, P89, 9mm, handgun, S/N: 304-23766, (1) Smith and Wesson, 39-2, 9mm, handgun, S/N: A421496. In my opinion, based in the location of the firearms to the drugs, T. TAYLOR being involved of drug sells, one of the firearms being stolen, previous arrest with firearm and rugs, the firearms located in Tevin TAYLOR's room were possessed in furtherance of a drug trafficking crime. Drugs seized from 11307 W. Cindy are presented in Figure 4.

  

Cocaine on microwave     Safe with drugs     Fentanyl pills from safe

(Figure 4 – Drugs seized from 11307 W. Cindy)

    b. At 2501 E. Douglas, investigators seized a 1006 grams of fentanyl mixture, 502 grams of cocaine, US Currency $44479, and electric money counter were located.

  

Fentanyl mixture on refrigerator     Cocaine on couch     US Currency

(Figure 5 – Drugs and money seized from 2501 E. Douglas)

26. During the search warrant at 11307 W. Cindy, Leigh TAYLOR told investigators, from September 2021 to November 2021, she saw a bag of Danny GRIFFINs at her house, 11307

W. Cindy, that contained approx. 8K pills and approx. $400K in cash. Leigh TAYLOR said she delivered pills from 11307 W. Cindy to customers for Danny GRIFFIN. Additionally, Leigh TAYLOR said Tevin TAYLOR holds drugs for Danny GRIFFIN. During Tevin TALOR's arrest on November 3, 2022, he admitted to selling drugs for Danny GRIFFIN and that the drugs located in 11307 W Cindy, as referenced in Figure 4, were from Danny GRIFFIN. Tevin TAYLOR told investigators that Danny GRIFFIN would come to the house at 11307 W. Cindy and pick up drugs or money from Tevin TAYLOR. In my opinion actions and statements made by Leigh TAYLOR and Tevin TAYLOR further supports their association to the Danny GRIFFIN drug distribution network, and that 11307 W. Cindy was used to store drugs. Screen shots of some of these transactions are presented in Figure 6.


4/10/2022


4/24/2022


5/24/2022

(Figure 6 – **A**: Tevin TAYLOR taking money or drugs to GRIFFIN in the black Durango; **B:** Tevin TAYLOR taking money or drugs to GRIFFIN white Benz; **C:** Tevin TAYLOR taking money or drugs to GRIFFIN in the white Benz)

27. Additionally, investigators observed a text conversation between Leigh TAYOR and Tevin TAYLOR about the cocaine that was located in the residence. In the conversation, Tevin TAYLOR text Leigh TAYLOR about "Martell's (alias of Danny GRIFFIN) stuff is above the microwave". This is the location investigators located the cocaine. In my opinion the cellular text conversation was used to facilitate a drug trafficking crime. The conversation is presented in Figure 7.

11



(Figure 7 – Text in Leigh TAYLOR's phone from her son Tevin TAYLOR about the cocaine on top of the microwave for Danny GRIFFIN)

28. Moreover, investigators observed a text conversation between Danny GRIFFIN and Tevin TAYLOR, where Danny GRIFFIN is asking Tevin TAYLOR about his "soft" and references "pills", both of which were located in 11307 W. Cindy. Danny GRIFFIN continues the conversation, threatening to set Tevin TAYLOR's cars on fire. In my opinion the cellular text conversation was used to facilitate a drug trafficking crime and shows that Danny GRIFFIN is running a network by the threatening his associates. The clip of this conversation is presented in Figure 8.



(Figure 8 – Text message sent to Tevin TAYLOR from Danny GRIFFIN)

29. During the search warrant at 2501 E. Douglas. Donte HOPKINS tells told investigators that he knew Danny GRIFFIN and Dalecia ANTHONY would access Douglas due to seeing

12

ammo and suspected drugs in apartment. Donte HOPKINS observed the narcotics on the fridge (1006 grams of fentanyl mixture) and the bag (502 grams of cocaine) on the couch. Donte HOPKINS told investigators about Danny GRIFFIN calling him frantically wanting him to look in 2501 E. Douglas for a bag on the couch. Donte HOPKINS located the bag (502 grams of cocaine) for Danny GRIFFIN, leaving it at the apartment. Investigators would observe Danny GRFFIN and others, including Dalecia ANTHONY, Donte HOPKINS, and Tevin TAYLOR go to the apartment, but no one appears to live at the apartment. In my opinion actions and statements made by Dalecia ANTHONY, Donte HOPKINS and Tevin TAYLOR further supports their association to the Danny GRIFFIN drug distribution network, and that 2501 E. Douglas was used to store drugs.  Clips from the surveillance at 2501 E Douglas are presented in Figure 9 -11.



(Figure 9 - On 4/24/22, **A:** Tevin TAYLOR bringing out drugs and/or money from 11307 W. Cindy to white Benz; **B:** Dalecia ANTHONY taking drugs and/or money into 2501 E. Douglas. Based on Danny GRIFFIN's GPS, he is in the vehicle with Dalecia ANTHONY)



13

(Figure 10 - On 5/26/22, **A:** Tevin TAYLOR bringing out drugs and/or money from 11307 W. Cindy to white Benz; **B:** Dalecia ANTHONY taking drugs and/or money into 2501 E. Douglas with Danny GRIFFIN)



(Figure 11 - On 6/21/22, Dalecia ANTHONY meeting a silver SUV exchanging bags and going into 2501 E. Douglas. Based on Danny GRIFFIN's GPS, he is in the vehicle with ANTHONY)

30. Investigators learned of additional traffic stop that involved Tevin TAYLOR in Wichita, Kansas, on November 7, 2021. Tevin TAYLOR ran from the traffic stop but was later identified. During the traffic stop law enforcement located containers of marijuana and THC edibles. A firearm was located between the drivers seat the center console. Based on the drugs located in the vehicle, proximity of the firearm to the drugs, and Tevin TAYLOR's involvement in the Danny GRIFFIN drug distribution network, it is my opinion that Tevin TAYOR possessed this firearm in furtherance of a drug trafficking crime.

31. Lastly, based on my overall knowledge of this investigation and similar investigations, including my training and experience, it is my opinion that Danny GRIFFIN, ran a drug enterprise that operated throughout the Midwest. Danny GRIFFIN developed a source of supply in Arizona for heroin, counterfeit prescription pills containing fentanyl, and cocaine. Danny GRIFFIN would utilize, known and unknown, members of his enterprise to transport these drugs from Arizona to Wichita. Once in Wichita, Danny GRIFFIN, would utilize members of this enterprise, to distribute hundreds of thousands of counterfeit prescription pills containing fentanyl, heroin, and cocaine, to his drug distribution network. As a means to conceal this activity from law enforcement, Danny GRIFFIN would use burner phones to communicate with members of the enterprise, and a stash house to conceal drugs and profits. Additionally, Danny GRIFFIN would use the profits from these selling drugs to purchase cars, jewelry, residences, business, travel, and finically support others, while flaunting it on social media. Danny GRIFFIN would utilize members of his enterprise to conceal his true involvement and/or ownership in these purchases. Moreover, Danny GRIFFIN would pay known and unknown individuals to carry out violent acts, such as shootings and setting fires,

against rivals, those who stole from him, or those who disrespected him. Danny GRIFFIN would then use this reputation of committing violence as a tool to manage his enterprise.